## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| ABBY BULLCREEK, et al.,<br><br>               **Plaintiffs,**<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>           **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No.  2:05CV203DAK** |

This matter is before the court on Defendants' Motion to Dismiss for Lack of Jurisdiction.   The court held a hearing on the motion on January 6, 2006.  At the hearing, Plaintiffs were represented by Paul EchoHawk, and Defendant was represented by Jeannette Swent.  The court took the matter under advisement.  The court has considered the memoranda and other materials submitted by the parties, as well as the law and facts relating to the motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

### BACKGROUND

There have been several unsuccessful legal challenges to a proposed lease between the Skull Valley Band of Goshute Indians ("Band") and Private Fuel Storage L.L.C. ("PFS") to allow for storage of spent nuclear fuel at a facility on the Skull Valley Indian Reservation in Utah.  Several members of the Band have brought two actions in this court seeking to reverse the Bureau of Indian Affairs' ("BIA") conditional approval of the proposed lease.  This court and

1

Judge Cassell have both previously dismissed the cases based on ripeness.  The Tenth Circuit Court of Appeals has affirmed both decisions.  There have also been lawsuits involving the State of Utah's attempts to block the lease from being implemented.

The present Complaint is an appeal by several members of the Band from two decisions of the Interior Board of Indian Appeals ("IBIA"), which dismissed Plaintiffs' claims for lack of ripeness and lack of standing.  One challenge involves the IBIA's decision regarding the BIA's conditional approval of the PFS lease and the other challenge is to the BIA's decision to recognize the Bear Leadership Group for purposes of conducting BIA's day-to-day business with the Band.  Plaintiff Abby Bullcreek and Plaintiff Margene Bullcreek each had appeals before the IBIA.  The IBIA consolidated the matters but issued separate decisions.  Although they overlap to some extent, the Abby Bullcreek decision deals with Plaintiffs' appeal of the BIA's conditional approval of the Proposed Lease, and the Margene Bullcreek decision deals with the issue of the government's recognition of tribal leadership.

On February 19, 1994, the Band's General Council authorized the Band's Executive Committee to enter into negotiations for the building of an interim storage facility for spent nuclear fuel on the Band's reservation in Tooele County, Utah.  The negotiations began in May 1996.  Through actions taken in December 1996 and April 1997, the General Council authorized the Band to enter into the lease with PFS.  On May 20, 1997, the Band's Chairman, Vice-Chairwoman, and Secretary and the Chairman of PFS signed an "Amended and Restated Business Lease Between Skull Valley Band of Goshute Indians and Private Fuel Storage, L.L.C." ("Proposed Lease").

*1.  BIA's Conditional Approval of PFS Lease*

Because the United States holds the land subject to the lease in trust for the Band, approval had to be sought from the Secretary of the Interior under 25 U.S.C. § 415(a).  In May 1997, the BIA approved the Proposed Lease between the Band and PFS subject to four conditions: (1) the completion of the Nuclear Regulatory Commission ("NRC") and the BIA's environmental analysis required under the National Environmental Policy Act; (2) the issuance of the environmental impact statement ("EIS"); (3) the issuance of the NRC license with a record of decision ("ROD"); and (4) the incorporation of mitigation measures identified in the ROD, if any, into the Proposed Lease.  Within thirty days of the satisfaction of each of these four conditions, the Secretary must certify that all of the conditions have in fact been satisfied.

Three of the four conditions have been met.  The Final EIS was issued in December of 2001, and the NRC recently issued a license.  To meet the final condition, BIA must issue its own ROD identifying any mitigation measures to be incorporated into the Proposed Lease.  Currently, there is no schedule for developing such mitigation measures.  The BIA likely will not issue its ROD until a transportation system is assured for moving the spent nuclear fuel from the interstate rail system to the proposed facility.  The Final EIS notes that any such transportation system would require approval from the Bureau of Land Management ("BLM") and possibly the Surface Transportation Board ("STB").  These entities have not approved a transportation system to date, and their schedules for completing the administrative processes are unknown.

On August 20, 2001, the Regional Director denied Plaintiff's administrative appeal on jurisdictional grounds, but also concluded that Plaintiffs had failed to prove error in the Superintendent's conditional approval of the lease.  The Regional Director addressed seven

3

categories of issues raised in the appeal: ripeness, standing, exhaustion of tribal remedies, allegations of impropriety and bribery, authority of the Tribe's General Council, environmental issues, and additional claims.  The Regional Director found that the appeal was premature and not ripe for review, that Plaintiffs lacked standing to bring the appeal because of the nature of the conditional approval and because they were individual members of the Band, that tribal remedies had not been exhausted, that claims of bribery, corruption, and impropriety were not redressable by BIA, that the lease had been properly authorized by the Tribe's General Council, and that any environmental concerns were not ripe.

Plaintiffs appealed the Regional Director's decision to the IBIA, which issued a decision on January 7, 2005.  In this decision, the IBIA concluded that because two of the jurisdictional grounds relied upon by the Regional Director– standing and ripeness– were dispositive, it did not need to address the exhaustion of tribal remedies issue, or the merits of Plaintiffs' challenges to the BIA's conditional approval of the lease.  The IBIA agreed that, as individual tribal members, Plaintiffs lack standing to challenge BIA's condition approval of the lease based on claims that the lease was not properly authorized by the Band's General Council, or that BIA's failure to first complete environmental reviews violated the Secretary's trust responsibility to the Band because both of these claims seek to assert claims based on tribal interests.  To the extent that the Plaintiffs' environmental challenges to the BIA's conditional approval of the lease could be construed as seeking to protect their interests, as individuals, from alleged adverse health, economic, or environmental effects that would result from the proposed storage facility, the IBIA concluded that the claims were not ripe.

On appeal to this court, Plaintiffs' main argument with regard to the BIA's conditional

approval of the PFS Lease is that the conditional approval by the BIA occurred without the proper authorization from the Band's General Council.  But their Complaint is not so narrowly tailored.  Plaintiffs' Complaint also argues that the BIA's conditional approval of the Proposed Lease injures them as follows:  (1) "A release of radiation from the stored material has the potential of causing widespread injury, death, property damage, and permanent harm to the environment of [Plaintiff's] homeland, " Compl. ¶ 45; (2) "By delegating environmental assessment responsibilities to the NRC, BIA officials have given partial approval to a project with unknown effects on the Reservation and its residents," *Id.* ¶ 55; (3) "Plaintiffs and other Band members have never been provided an adequate copy of the lease or otherwise had a meaningful opportunity to review and comment on its contents," *Id.* ¶ 57; and (4) Plaintiffs suffer "present adverse affects [sic] . . . because the conditional lease approval has forced the Plaintiffs to expend already-limited resources in the NRC proceeding, federal court proceedings, and other informal public efforts in opposition to the proposed facility that, but for the BIA's conditional approval of the lease, would not otherwise be required," *Id*. ¶ 60.

　　2.  *Tribal Leadership Dispute*

　　The second IBIA decision on appeal in this case is the dismissal of Plaintiffs' challenge to a decision by the Superintendent of the Uintah and Ouray Agency regarding a dispute over leadership among members of the Band.  Plaintiffs allege that procedures for tribal elections in November of 2000 were flawed and that Leon Bear and Lori Skiby (The "Bear Leadership Group") were recalled from any leadership positions within the Band at a meeting held on August 25, 2001 and that a re-affirmation of the recall occurred on September 22, 2001.  They also allege that improper procedures invalidated an election on October 13, 2001, when the Bear

Leadership Group claims it was re-elected or re-affirmed.

Several different members of the Band had contacted the Superintendent regarding the leadership disputes.  On March 25, 2002, the Superintendent wrote a letter to Leon Bear, as Chairman of the Band, referring to the ongoing intra-tribal dispute regarding leadership and informing Bear that the BIA would continue to conduct routine business with the Tribe through the Bear Leadership Group until the Band resolved its internal leadership dispute.  The letter stated that this interim decision was made in order to avoid disruption of contract payments to the Band during the ongoing dispute.  With respect to the ongoing leadership disputes, the Superintendent recognized that the BIA's "sole role in such an endeavor is to assist tribes where possible, but not to impose its decisions upon them."  The Superintendent, however, further states:

> In light of the layered controversies now swirling around the Band, and in response to the inquiries made, the BIA, with help of the Office of the Solicitor, has made an exhaustive study of the Band's governing documents and ordinances, including those provided by the legal counsel for the various factions, which purport to identify and confirm the existing tribal government, and the various allegations and accusations from diverse parties who both challenge the leadership and make alternative claim to it.  The outcome of this study is that the BIA has discovered no event since the Band entered the lease with PFS that conclusively alters the Band's choice of Leon Bear as the Chairman of the General Council and its Executive Committee.  HOWEVER, as noted above, it is ultimately up to the Band to decide this issue.

The letter also did not discuss or decide what claim, if any, an individual tribal member would have to contract payments.

Plaintiffs appealed this action administratively and, on November, 14, 2002, the Western Regional Director, Bureau of Indian Affairs, affirmed the Superintendent's position.  Plaintiffs

appealed the Regional Director's decision to the IBIA, and the IBIA dismissed their appeal for lack of standing.  With regard to Plaintiffs' claim that they have been adversely affected because they have been excluded from benefits and economic dividends because of the leadership controversy, the IBIA found that Plaintiffs failed to describe any specific or particularized injury.  Even if they could have demonstrated some concrete injury, the IBIA found that the injury would not be fairly traceable to the Regional Director's decision.

Plaintiffs do not allege that they should have been elected to tribal leadership positions or that the interim decision has deprived them of such positions.  Rather, they allege that they have been "adversely affected because they have been excluded from Pub. L. 93-638 benefits and Band economic dividends as a result of the BIA's actions."  Compl. ¶ 71.  In addition, they allege that "their rights to participate in a fair Band election process have been injured" and "the adverse impact of the Superintendent's decisions on the future of their Reservation as the site of the PFS nuclear waste storage facility provides a basis for standing." *Id.*  Plaintiff OGD also alleges that its and its members interests in preserving the integrity of a traditional Band government have been adversely affected by the Superintendent's decisions. Compl. ¶ 72.

Plaintiffs' prayer for relief in this case includes requests that the court reverse the IBIA's conditional approval of the Proposed Lease, reverse the Superintendent's interim decision to recognize the Bear Leadership Group, and order an immediate new election for tribal leaders.

## DISCUSSION

## Defendants' Motion to Dismiss

The government moves to dismiss Plaintiffs' Complaint arguing that this court lacks jurisdiction over Plaintiffs' claims.  First, the government argues that Plaintiffs' challenge to the

BIA's conditional approval of the proposed lease is not ripe for judicial review because the administrative processes surrounding the proposed lease are ongoing. Second, the government contends that Plaintiffs lack standing to challenge both the BIA's conditional approval of the proposed lease and the Superintendent's decision regarding how to conduct business with the Skull Valley Band of Goshute Indians ("the Band") until the Band resolves its own internal struggle over tribal leadership.

Plaintiffs' response to the government's motion to dismiss is much narrower than their Complaint. Plaintiffs' main contention is that the issue of the BIA's conditional lease approval is justiciable. Plaintiffs assert that the proposed lease was not presented to or approved by the General Council of the Band and the court must accept these facts as alleged in the Complaint as true on a motion to dismiss. Assuming these facts as true, Plaintiff's contend that the issue is a purely legal issue of whether the lack of prior tribal approval of the Proposed Lease renders the BIA's conditional approval improper under 25 U.S.C. § 415(a).

Plaintiffs' argument, however, focuses on the underlying merits of their arguments before the Regional Director and the IBIA. The Regional Director determined that there was no merit to the Plaintiffs' claim that the General Council did not properly approve the Proposed Lease. The court cannot, as Plaintiffs suggest, merely assume that the factual allegations in Plaintiffs' Complaint are true in the context of this case. This is an appeal of an administrative decision and the administrative record is before the court. The IBIA determined that it need not reach the merits because of the jurisdictional issues of ripeness and standing. Plaintiffs' Complaint is an appeal of that decision. Even if Plaintiffs could appeal the decision on the merits made by the Regional Director, Plaintiffs would have to demonstrate that the decision was not based on

substantial evidence.  Plaintiffs have not attempted to meet this burden.

## I. Ripeness Doctrine

One of the purposes of the ripeness doctrine is "to protect agencies from judicial interference until an administrative decision has been formalized and its effects felt in some concrete way by the challenging party."  *See Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).  The BIA's conditional approval of the Proposed Lease is not final and construction is not imminent.  Because the approval is conditional there is a possibility that the facility will never be built.  *See Friends of Marolt Park v. United States Dep't of Transp.*, 382 F.3d 1088, 1093 (10th Cir. 2004) (ruling that challenge to proposed highway was not ripe for judicial review, stating "there is nothing concrete about a highway that may never be built.").

The Tenth Circuit determines whether an agency decision is ripe for judicial review by examining (1) the fitness of the issues for judicial decision, and (2) the hardship caused to the parties if review is withheld.  *Friends of Marolt Park*, 382 F.3d at 1093.  The Supreme Court has listed three factors for evaluating ripeness:  (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.  *Ohio Forestry*, 523 U.S. at 733.

### 1. Will Delay Cause Hardship to Plaintiffs?

Plaintiffs attack the propriety of the Proposed Lease in many ways.  They assert that a  release of radiation from the stored material has the potential of causing widespread injury, death, property damage, and permanent harm to the environment and the BIA has improperly delegated environmental reviews to the NRC.  But no final decision approving the

Proposed Lease has been made.  Plaintiffs' challenge to the Proposed Lease may be rendered

moot by the ongoing administrative proceedings.  There remains one final condition to be met.

If all of the conditions are not met, Plaintiffs alleged injuries from the Proposed Lease will never

materialize.  In addition, if all of the conditions are not met, the BIA will not certify the

Proposed Lease and it will be immaterial whether or not there was proper approval by the tribe.

If certification occurs at a later date, a party with standing will be able to appeal that certification

and attack all aspects of the lease approval process.

Plaintiffs recognize the ability to bring action after the final approval.  However, they

assert that a delay in judicial review of the BIA's conditional lease approval will perpetuate the

continuing intra-tribal dispute and cause further hardship to Plaintiffs in that they will continue

to be precluded from participating in the Band's political processes and benefits.

Plaintiffs' alleged hardship, however, is the result of intra-tribal matters rather than a

result of the propriety of the BIA's actions.  There is no evidence that a decision with respect to

the issue of the Band's prior approval of the lease would alleviate the alleged hardships.

*2. Will Judicial Intervention Inappropriately Interfere with Administrative Action?*

As to the second factor regarding judicial interference with administrative action, this

court has previously stated that "[t]he involvement of this Court at this time could hinder the

BIA's efforts to refine its conditional decision through the information to be received from the

ongoing environmental and licensing review."  *State of Utah v. United States Dep't of Int.*, Case

No. 2:98CV380K, Order dated Feb. 14, 2000 (*"Blackbear I"*).

Plaintiffs argue that judicial intervention will not interfere with further administrative

action because the issue of the whether the Band's General Council properly approved of the

10

lease before the BIA issued its conditional lease approval is not being considered in any federal administrative forum and there is no other administrative remedy available to the Plaintiffs to raise the issue.

Plaintiffs, however, have had the opportunity to raise this issue before the Regional Director and the IBIA.  The Regional Director found the issue to be without merit.  Although the IBIA determined that it need not reach the merits of the appeal at this time because of the jurisdictional issues, Plaintiffs have been able to raise this issue in the administrative process. The issue is whether the determination of Plaintiffs' allegations should occur now while the administrative process is ongoing or whether they should be decided after the administrative process is complete and there is a final decision.

Plaintiffs' Complaint seeks to have the entire administrative process halted as a result of this issue.  Plaintiffs' Complaint also asserts several other attacks against the Proposed Lease in general.  The BIA, however, expects to have the opportunity to complete its process, including requiring the Proposed License to be revised to include environmental mitigation measures based on the Final EIS.  This BIA process would depend on the results of the agency action taken by the BLM and the STB in examining any proposed transportation systems between the interstate rail system and the proposed facility.  Judicial interference at this point would prematurely cut off the opportunity for the BIA, BLM, and STB to apply their expertise to the issues presented by the Proposed Lease.  This is precisely what the ripeness doctrine seeks to avoid.

### 3. Would the Court Benefit from Further Factual Developments?

The third factor regarding further factual development also weighs in favor of the government.  The Tenth Circuit, this Court, and the IBIA have all clearly stated that they would

benefit from further factual development of the issues before ruling on them.  Environmental and safety concerns, possible changes to the Proposed Lease regarding mitigation measures, and the Secretary's decision to certify all remain to be resolved in the ongoing administrative processes. Uncertainty regarding the outcomes of each of these steps justifies postponing any decision on Plaintiffs' claims.  These factors demonstrate that Plaintiffs' claims are not ripe for review.

The Tenth Circuit has found that a case is not ripe where "vital contingencies remain to be resolved" and the impact on plaintiffs from the agency action "rest upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Friends of Marolt Park*, 382 F.3d at 1094.  This decision is dispositive here.  The ongoing administrative process involves vital contingencies that remain to be resolved.  The BIA's conditional approval of the Proposed Lease does not give anyone a legal right to build the proposed facility nor does it abolish anyone's legal right to object to the construction of the proposed facility at the proper time.

Plaintiffs argue that they have exhausted their administrative appeals regarding the conditional lease approval through the Department of the Interior and there are no pending or available remaining administrative processes wherein Plaintiffs' challenge to the BIA's conditional lease approval can be further developed factually with respect to whether the lease was entered into with proper tribal authority prior to the BIA's conditional approval.  Although the Regional Director reached the merits of the issue, the IBIA did not reach the merits because of the jurisdictional issues.  Therefore, even if this court were to reverse the IBIA's decisions regarding ripeness and standing, this court would be required to remand the case to the IBIA to consider and decide the merits.  Accordingly, the merits of Plaintiffs' claim is not before this

court.  Moreover, Plaintiffs Complaint is far broader than merely the conditional approval issue.

Much of the Complaint attacks the entire lease approval process.  Accordingly, the court

concludes that Plaintiffs' challenge to the IBIA decision is not ripe for decision.

## II.      Standing

The government asserts that Plaintiffs have a two-part burden of establishing their

standing to bring this suit.  *Western Shoshone Business Council v. Babbitt*, 1 F.3d 1052, 1055

(10th Cir. 1993).  In order to establish standing, Plaintiffs must meet (1) the constitutional

requirements subsumed by the Article III "case or controversy" limitation on judicial power, and

(2) the judicially created prudential requirements under the APA.  *Id.*  The government argues

that Plaintiffs cannot establish either type of standing to appeal from either IBIA decision.

In order to establish constitutional standing, a party must demonstrate: (1) injury in fact,

which means an invasion of a legally protected interest that is (a) concrete and particularized,

and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the

injury and the challenged conduct; and (3) a likelihood that the injury will be redressed by a

favorable decision.  *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1233 (10th

Cir. 2004).

In order to establish prudential standing under the APA, Plaintiffs must show that agency

action has caused them to suffer a "legal wrong" or has "adversely affected or aggrieved" them.

*Western Shoshone Business Council*, 1 F.3d at 1055.  In particular, Plaintiffs must show that the

interests they seek to protect through this lawsuit are "arguably within the zone of interests to be

protected or regulated by the statute . . . in question."  *Id.*

**A.  BIA's Conditional Approval of Proposed Lease**

*1.  Constitutional Standing*

Plaintiffs have not suffered a concrete or particularized injury as a result of the BIA's conditional approval of the Proposed Lease.  The allegations of possible future harm are hypothetical.  And, Plaintiffs' claim that they have been forced to spend valuable resources in mounting legal challenges to the Proposed Lease is not a recognized injury for purposes of finding standing.  Otherwise, all litigants would automatically have standing based solely on the expense of bringing their action.  Because Plaintiffs' have not demonstrated an injury-in-fact, Plaintiffs do not have constitutional standing to challenge the BIA's conditional approval of the Proposed Lease.  *See State of Utah v. Babbitt*, 137 F.3d 1193, 1212 (10ᵗʰ Cir. 1998).

*2.  Prudential Standing*

Plaintiffs argue that because 25 U.S.C. § 415(a) requires approval by the Indian Landowner prior to the Secretary of the Interior's approval of leases, Section 415(a) provides a basis for Plaintiffs' standing.  But the government contends that Plaintiffs' interest in blocking the Proposed Lease is not within the zone of interests to be protected by Section  415(a).

Section 415(a) protects the ability of owners of restricted Indian lands to lease those lands with the approval of the "Indian Landowner."  An Indian Landowner is defined as "a tribe or individual Indian who owns an interest in Indian land in trust or restricted status."  25 C.F.R. § 162.101.  Several courts have found that the zone of interest protected by Section 415(a) does not extend to non-owners of Indian land.  *See, e.g., Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1036-37 (8th Cir. 2002).

Plaintiffs argue that this court previously discussed standing under Section 415(a) and

14

stated that the interest of individual tribal members, such as Sammy Blackbear and Margene Bullcreek, are arguably within the zone of interests to be protected by Section 415 under the APA.  The court further stated that while the Secretary's Section 415 trust responsibility is owed to the Band as a tribal government, it does not prevent individual tribal members from accessing federal courts for the purpose of reviewing the Secretary's performance of such responsibilities under the APA.

While this court discussed standing in the *Blackbear* case, it was in a different context. The current argument based on the definition of "Indian Landowner" was not before the court in that case.  Plaintiffs have not claimed to be landowners or to hold an interest in the land in question.  The Band is the only Indian Landowner in relation to this case.  Because Plaintiffs are not Indian Landowners protected by Section 415(a), they lack standing for their current challenge.

### B.  Recognition of Tribal Leadership

*1.  Constitutional Standing*

With respect to the Plaintiffs' appeal of the Superintendent's interim decision regarding relations with tribal leadership, Plaintiffs allege three injuries:  (1) they have been excluded from Pub. L. 93-638 benefits and Band economic dividends as a result of the BIA's actions; (2) their rights to participate in a fair Band election process have been injured; and (3) they have suffered adverse impact of the Superintendent's decisions on the future of their Reservation as the site of the PFS facility.  Plaintiff OGD also alleges that the decisions of the Superintendent injured its interests in preserving the integrity of a traditional Band government.

The IBIA found that its precedent was well-established that an individual tribal member

15

does not have standing to appeal internal disputes and disputes over the BIA's recognition of a tribe's leadership.  The IBIA explained that these rules regarding standing are intended to implement the federal policy of respect for tribal self-government and the principle that intra-tribal disputes should be resolved in tribal forums.

This court agrees with the IBIA that even if Plaintiffs could state the requisite concrete injury, the injury would not be fairly traceable to the BIA's actions but, rather, to the actions of the Bear Leadership Group.  The Superintendent's duty under Pub. L. 93-638, § 2, 88 Stat. 2203 (1975), is to provide funds to the Band according to the terms of the contract between the BIA and the Band.  *See, e.g., FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir. 1995). The BIA does not contract with individual tribal members and the Superintendent does not provide funds to individual tribal members but to the tribe as a whole.  Pursuant to the regulations, the tribe the "accepts the responsibility and accountability to the beneficiaries under the contract with respect to use of the funds."  *See* 25 C.F.R. § 900.3(b)(4).  There is no regulation providing governmental oversight of the tribe's role in administering the benefits. And, there is no provision or regulation providing an individual tribal member with the right to benefits.

The Superintendent's decision to recognize one group for purposes of conducting day-to-day business with the tribe also does not deprive individuals from participating in fair elections. The election procedures are a matter of tribal law.  In a case where the BIA refused to recognize either of the rival leadership groups in a dispute, the Eighth Circuit "commend[ed] the BIA for its reluctance to intervene in the election dispute" but found "it was an abuse of discretion for the BIA to refuse to recognize one council or the other until such time as Indian contestants could

16

resolve the dispute themselves."  *Goodface v. Grassrope*, 708 F.2d 335, 339 (8th Cir. 1983).

The court ordered the BIA, "in its responsibility for carrying on governmental relations with the

Tribe, . . . to recognize and deal with some tribal governing body" until the tribe resolved its own

election dispute.  *Id.*

  In this case, the Superintendent made an interim decision in order to meet his

responsibility for carrying on governmental relations with the Band until it resolves its own

leadership dispute.  That decision, however, does not interfere with the Band's ability to resolve

the dispute itself and to carry out its own fair elections.  The BIA decision is entirely separate

from the Band's election process.

  Moreover, the Plaintiffs' apparent attempts to challenge the Proposed Lease through the

superintendent's decisions fail to establish standing because that decision does not relate to PFS.

The recognition of one leadership body in order to carry out government relations with the Band

does not relate to whether the conditional approval will materialize into a final approval.

  Therefore, the court finds that Plaintiffs have not demonstrated an injury-in-fact traceable

to the BIA's decision that could be redressed by this court.  Therefore, the court concludes that

Plaintiffs lack constitutional standing to bring a claim regarding the BIA's decision to conduct

day-to-day relations with the Band through the Bear Leadership Group.

  *2.  Prudential Standing*

  To establish prudential standing with respect to Plaintiffs' appeal of the Superintendent's

decision regarding relations with the Band, Plaintiffs must identify a statute that provides a zone

of protection.  Plaintiffs cite to several statutes, many of which appear to have no relation to the

leadership issue in question.  Plaintiffs also rely on Pub. L. 93-638 to assert that their failure to

receive benefits from the leadership group recognized by the BIA puts them within the zone of interests to be protected by the law.  All of Plaintiffs' alleged injuries with regard to the Superintendent's decision, however, relate to internal tribal matters that cannot provide a basis for jurisdiction in federal court.

"Indian tribes are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978) (citation omitted).  "[T]hey remain a 'separate people, with the power of regulating their internal and social relations.'" *Id.* (citations omitted).

Under the provision of benefits under Pub. L. 93-638, however, Plaintiffs have not identified any provision in the statute or implementing regulations that requires the government to oversee a tribe's internal disbursement of the funds.  The regulations make the administration of funds the responsibility of the tribe.  *See* 25 C.F.R. § 900.3(b)(4).

With respect to procedures for a fair election, Plaintiffs have not cited to any statute that allows for the government to get involved in decisions of the tribe's internal election procedures or laws.  Plaintiffs try to establish standing through the Declaration of Margene Bullcreek.  But Bullcreek admits that "the procedures whereby all tribal business would be conducted, including Executive Committee elections" are established by a tribal resolution.  Thus, Plaintiffs admit that their rights to a fair Band election process would have to be determined pursuant to the tribal resolution rather than federal law.

Plaintiffs argue that while they recognize the importance of tribal sovereignty, the government also has a trust relationship with the tribe that requires the government to become involved in certain situations.  Although the IBIA found that Plaintiffs lacked standing on this

18

issue, the Superintendent's letter recognizes that the BIA's "sole role in such an endeavor is to assist tribes where possible, but not to impose its decisions upon them."  Nonetheless, the Superintendent's letter further states:

> In light of the layered controversies now swirling around the Band, and in response to the inquiries made, the BIA, with help of the Office of the Solicitor, has made an exhaustive study of the Band's governing documents and ordinances, including those provided by the legal counsel for the various factions, which purport to identify and confirm the existing tribal government, and the various allegations and accusations from diverse parties who both challenge the leadership and make alternative claim to it.  The outcome of this study is that the BIA has discovered no event since the Band entered the lease with PFS that conclusively alters the Band's choice of Leon Bear as the Chairman of the General Council and its Executive Committee.  HOWEVER, as noted above, it is ultimately up to the Band to decide this issue.

Based on this effort, the court cannot find the BIA has not attempted to undertake and fulfill its trust responsibilities to the Band with respect to the leadership decisions.  These facts do not demonstrate the type of case in which this court would be willing to decide that some overarching aspect of the BIA's trust responsibilities outweighed the settled law regarding the recognition of tribal self-government.  The facts here demonstrate that the BIA has taken its responsibilities with respect to the Band seriously and it has expended significant efforts to determine the matters presented to it.  In any event, because this is an appeal of the IBIA decision, this court's decision must focus on the jurisdictional issue of standing as decided by the IBIA.

Plaintiffs assert that they meet the standing requirement because they have an adequate interest and injury to give them standing to challenge the Superintendent's decision regarding the leadership dispute.  Under applicable regulations and legal standards, Plaintiffs assert that any

interested party affected by a final BIA decision may file an appeal. *Reindeer Hers Assoc. v. Juneau Area Director*, 23 IBIA 28, 44-45 (1992). Because Board regulations do not define an "interested party" for purposes of appeals from BIA decisions, the Board employs the definition in BIA's appeal regulations at 25 C.F.R., Part 2. 25 C.F.R. § 2.2 defines "interested party" as "any person whose interests could be adversely affected by a decision in an appeal." The section also defines "person" to include "an Indian or non-Indian individual, corporation, tribe, or other organization." 25 C.F.R. § 2.2.

While all of these regulations may allow for an individual to appeal certain IBIA decisions to this court, it does not follow that they require this court to reverse the IBIA's decision that Plaintiffs lack standing to challenge the BIA's decision to conduct day-to-day relations with the Band through a certain leadership group. This court agrees that it has jurisdiction under 28 U.S.C. § 1331 to review agency action pursuant to the APA. However, Plaintiffs have not met their burden of demonstrating that they have constitutional or prudential standing with regard to the BIA's decision regarding relations with the Bear Leadership Group.

The IBIA held that individual tribal members lack standing to bring appeals involving internal tribal disputes and disputes of BIA's recognition of a tribe's leadership. Plaintiffs attempt to distinguish several of the cases relied upon by the government in relation to tribal self-government on the grounds that the Band has no tribal court or means of dispute resolution. Plaintiffs, however, do not provide any contrary statute or case law establishing this court's or the BIA's ability to intervene in intra-tribal disputes when no such mechanisms exist within the tribe. There is a General Council and Executive Committee that is in place to determine the interests of the Band. Without specific statutory or jurisprudential authorization, this court

declines to determine that either the BIA or this court sits as an automatic appellate venue for any disputes or disagreements individual tribal members may have with decisions of the Band's General Council.

Because Plaintiffs have not established that they are within the protected zone of any federal law, they have not established prudential standing for their claim regarding the Superintendent's decision to conduction relations with the Bear Leadership Group.  Accordingly, the court dismisses Plaintiffs' action.[1]

## CONCLUSION

Based on the above reasoning, Defendants' Motion to Dismiss is GRANTED, and Plaintiff's Complaint is dismissed.  Plaintiffs' challenge to the BIA's conditional approval of the Proposed Lease is not ripe for review and Plaintiffs' lack both constitutional and prudential standing to raise the claim.  Plaintiffs also lack standing to raise their claim regarding the BIA's decision to conduct day-to-day relations with the Bear Leadership Group.

DATED this 29th day of March, 2006.

BY THE COURT:

_____
DALE A. KIMBALL,
United States District Judge

---

[1] Although Plaintiffs appeal from a final decision of the IBIA on the Superintendent's decision to deal with the Bear Leadership Group for day-to-day business with the Band rather that a decision on a specific election outcome, in a previous appeal of a related case, the Tenth Circuit, recognizing that "[s]everal elections and recall elections have led to bitter disputes over tribal leadership," stated that "the proper method for contesting [disputed] election results, however, is to file a complaint with the Secretary of the Interior" under 25 C.F.R. § 81.22. *Blackbear v. Norton*, 2004 WL 407037, at **2 (10th Cir. Mar. 5, 2004).  The present case was not initiated as a complaint under that provision.